UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JENNIFER LEE RIVERA,       )
       Plaintiff,         )
                             )
                             )
       v.                )       Civil No. 3:19-cv-30139-KAR
                             )
                             )
ALTRANAIS HOME CARE LLC,   )
       Defendant.       )


MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT, PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT, AND DEFENDANT'S MOTION TO STRIKE
(Dkt Nos. 45, 49, and 60)

ROBERTSON, U.S.M.J.

      Jennifer Lee Rivera ("Plaintiff") brings this action against her former employer Altranais

Home Care LLC ("Defendant") asserting claims for disability discrimination and retaliation in

violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12102 *et seq*., as

amended by the Americans with Disabilities Amendments Act ("ADAA"), and the

Massachusetts anti-discrimination law, Mass. Gen. Laws ch. 151B.  Presently before the court

are Defendant's motion for summary judgment (Dkt. No. 45), Plaintiff's motion for partial

summary judgment (Dkt. No. 49), and Defendant's motion to strike certain material from the

summary judgment record (Dkt. No. 60).  The parties have consented to this court's jurisdiction.

*See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73 (Dkt. No. 9).  For the following reasons, Defendant's

motion for summary judgment is GRANTED in part and DENIED in part. Plaintiff's motion for

partial summary judgment is DENIED, and Defendant's motion to strike is DENIED.

## I.      STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue is 'genuine' when a rational factfinder could resolve it either direction."  *Mu v. Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 5 (1st Cir.), *rev. denied*, 885 F.3d 52 (1st Cir. 2018) (citing *Borges ex rel. S.M.B.W. v. Serrano–Isern*, 605 F.3d 1, 4 (1st Cir. 2010)).  "A fact is 'material' when its (non)existence could change a case's outcome.  *Id*. (citing *Borges*, 605 F.3d at 5).

A party seeking summary judgment is responsible for identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'"  *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325).  If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute."  *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The record is viewed in favor of the nonmoving party, and reasonable inferences are drawn in the nonmoving party's favor.  *See Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (citing *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68 (1st Cir. 2015)).  "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  *Adria Int'l Grp., Inc. v. Ferré Dev., Inc.*, 241 F.3d 103, 107

(1st Cir. 2001) (citing *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

### A.  FACTUAL BACKGROUND[1]

Defendant is a home health care company that provides skilled nursing services, physical therapy, speech, and occupational therapy to patients who cannot leave their homes (Dkt. No. 54 at ¶ 3; Dkt. No. 65 at ¶ 1).  Plaintiff began working for Home Care VNA, LLC, a small sister agency of Defendant, in January 2017 (Dkt. No. 65 at ¶ 3-4).  Plaintiff was hired to perform quality assurance for home health aides.  She initially worked at Home Care's Chicopee, MA location (Dkt. No. 65 at ¶ 4).  Plaintiff had no prior office experience or degree at the time she was hired, and she was the only unlicensed employee in the quality assurance department (Dkt. No. 65 at ¶ 5).  Her position was clerical in nature and did not require special training or licensure (Dkt. No. 65 at ¶ 5).

In approximately June or July 2017, Plaintiff was transferred from Home Care to Defendant, where she continued performing quality assurance for home health aides, working in Defendant's office located on the first floor at 235 Chestnut Street, Springfield, MA (Dkt. No. 54 at ¶¶ 2,5; Dkt. No. 65 at ¶ 6).  Plaintiff reported to Keyla Cruz, RN, BSN, who was responsible for managing the Springfield office (Dkt. No. 54 at ¶¶ 32, 34, 36; Dkt. No. 65 at ¶ 6).  Among her other responsibilities, Ms. Cruz trained staff on the Americans with Disabilities Act ("ADA") (Dkt. No. 54 at ¶ 41).  The co-founders and co-owners of the company, Constant Ogutt and Shakira Lubega, had no ADA training (Dkt. No. 54 at ¶¶ 39-40; Dkt. No. 65 at ¶ 2).

---

[1] The facts are taken from the consolidated statements of facts (Dkt. Nos. 54 and 65), as well as the materials cited therein.  To the extent the court cites paragraphs Defendant has moved to strike, the court explains its reasoning for rejecting Defendant's arguments in footnotes accompanying the citations.  Other paragraphs Defendant has moved to strike that are not cited are immaterial to this decision and, therefore, the question of whether to strike them is moot.  Accordingly, Defendant's motion to strike is denied in its entirety.

Plaintiff was initially assigned to share an office with a co-worker named Denisha (Dkt. No. 54 at ¶ 27; Dkt. No. 65 at ¶ 9). Denisha was not an ideal office mate: she played loud music and argued on the phone (Dkt. No. 54 at ¶ 29; Dkt. No. 65 at ¶ 9). In addition, the office that Plaintiff and Denisha shared had no window (Dkt. No. 54 at ¶ 29; Dkt. No. 65 at ¶ 9). The office environment triggered Plaintiff's pre-existing anxiety,[2] and in July or early August 2017, Plaintiff asked Ms. Cruz if she could have her own office (Dkt. No. 54 at ¶ 31; Dkt. No. 65 at ¶ 9). Ms. Cruz communicated Plaintiff's request to Human Resources and later told Plaintiff that she could work out of the office that had been assigned to Ms. Lubega, who, in addition to being a co-owner of Defendant, acted as its Assistant Administrator (Dkt. No. 65 at ¶¶ 2, 9). Among other responsibilities, Ms. Lubega recruited, hired, and interviewed nurses and wanted an office to talk privately to candidates and employees, including to issue discipline, which she preferred to do in her own office (Dkt. No. 65 at ¶ 8). However, when Plaintiff began to use Ms. Lubega's office, Defendant had just moved into the building, and Ms. Lubega had not yet used it (Dkt. No. 54 at ¶ 62; Dkt. No. 65 at ¶ 7). Furthermore, Ms. Lubega did not spend a lot of time in the Springfield office, and when she was there at the same time as Plaintiff, she would work in the conference room instead of her assigned office (Dkt. No. 54 at ¶ 78; Dkt. No. 65 at ¶ 10).

Shortly after Plaintiff began to use Ms. Lubega's office, in the early morning hours of August 7, 2017, Plaintiff's boyfriend was murdered while she was waiting in the car for him. When she got out of the car, she saw him and one other person dead (Dkt. No. 54 at ¶ 45; Dkt. No. 65 at ¶ 11). Not unexpectedly, the event was traumatic for Plaintiff, and, later that day, Plaintiff went to an emergency appointment with her therapist, Jacqueline Santiago, whom she

---

[2] Plaintiff has been treated, initially for depression, and subsequently for anxiety and post-traumatic stress disorder ("PTSD"), since approximately 2013 (Dkt. No. 54 at ¶ 7).

had been seeing on a bi-weekly basis since approximately 2015 (Dkt. No. 54 at ¶¶ 8, 18; Dkt.

No. 65 at ¶12).  Ms. Santiago provided Plaintiff with a note stating:

> I am writing this letter on the behalf of my client Jennifer Rivera
> …. Jennifer has been receiving services at our clinic since
> 2014. A recent event has exacerbated depression and anxiety and it is
> required for Jennifer to be out of work for the next 3 weeks,
> starting August 7, 2017 until August 28.
>
> If you have any further questions please call me at 413-532-0389

(Dkt. No. 54 at ¶ 46; Dkt. No. 65 at ¶ 12; Dkt. 47-8; Dkt. No. 51-3).[3]  Plaintiff gave the note to

Ana Morales in Defendant's Human Resources Department and requested three weeks of leave,

which Defendant granted (Dkt. No. 54 at ¶¶ 47-48, 53; Dkt. No. 65 at ¶ 12).

When Plaintiff returned from her three-week leave, she continued to use Ms. Lubega's

office, which had a window to the outside (Dkt. No. 54 at ¶ 54; Dkt. No. 65 at ¶ 12).  Ms.

Lubega allowed Plaintiff to work out of her office because Plaintiff was grieving, and Ms.

Lubega was in the process of having an office next to hers set up for Plaintiff.  The other office

was identical in size but did not have a window (Dkt. No. 65 at ¶¶ 13, 19).  Mr. Ogutt told Ms.

Cruz to be as flexible as she could with Plaintiff during this time (Dkt. No. 65 at ¶ 14).  In

particular, Mr. Ogutt instructed Ms. Cruz that if Plaintiff needed more time off or a flexible

schedule, she could have it (Dkt. No. 65 at ¶ 14).  In the aftermath of the murder, Plaintiff

increased the frequency of her therapy appointments to once per week, and she went to those

appointments during the workday (Dkt. No. 54 at ¶ 22; Dkt. No. 65 at ¶ 15).  Ms. Cruz accepted

Plaintiff's absences because Plaintiff's work was always done, and Ms. Cruz understood that

Plaintiff was seeking help and obtaining the treatment she needed (Dkt. No. 65 at ¶ 15).  On one

occasion after the murder, during a crowded meeting in the conference room, Ms. Cruz observed

---

[3] Communications from Ms. Santiago and others that are part of the summary judgment record
are reproduced verbatim without a notation indicative of grammatical or spelling errors.

some behaviors that suggested to her that Plaintiff was scared (Dkt. No. 65 at ¶ 16).  Ms. Cruz

told Plaintiff to leave the meeting and brought her back to her office (Dkt. No. 54 at ¶ 80; Dkt.

No. 65 at ¶ 16).

According to Defendant, as time went on, Ms. Lubega began to spend more time in the

Springfield office than she had previously, and she would be there for four or more hours per day

(Dkt. No. 65 at ¶ 17).  Plaintiff disputes this and maintains that Ms. Lubega was rarely in the

Springfield office (Dkt. No. 65 at ¶ 17).  The parties do not dispute, however, that Ms. Lubega

was unhappy with the situation and on multiple occasions asked Ms. Cruz about Plaintiff

continuing to occupy her office (Dkt. No. 54 at ¶ 101; Dkt. No. 65 at ¶ 17).  Ms. Cruz told Ms.

Lubega that Defendant had to accommodate Plaintiff (Dkt. No. 54 at ¶ 101).  When the office

next to Ms. Lubega's was ready, Plaintiff was asked to move into it, but she refused because of

the lack of a window (Dkt. No. 65 at ¶ 19).  Having a window helped Plaintiff control her mental

health symptoms (Dkt. No. 54 at ¶ 55).[4]  When Plaintiff worked in the office with the window,

she could avoid the feeling of being trapped by looking out the window and seeing things like

---

[4] Defendant has moved to strike paragraph 55 of Plaintiff's statement of facts from the summary judgment record on the ground that Defendant had no knowledge of the symptoms or behaviors associated with Plaintiff's mental health conditions during her employment.  The court declines to strike paragraph 55.  To support the fact in question, Plaintiff cites to her own affidavit submitted in support of her motion for partial summary judgment, and Defendant has not argued that the affidavit fails to comply with the requirements of Fed. R. Civ. P. 56 (c)(4) (requiring that affidavits used to support or oppose summary judgment motions be made on personal knowledge, set forth facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated).  Accordingly, there is no basis for striking the paragraph, which, in any case, makes no representation about Defendant's knowledge (or lack thereof) of the information in the paragraph.

trees and the movement of birds, thereby allowing her to evade or minimize anxiety attacks (Dkt. No. 54 at ¶ 24).[5]

Plaintiff told Ms. Cruz that she needed to have her own space and be away from people (Dkt. No. 65 at ¶ 18).  She also communicated to Ms. Cruz that not having a window made her feel trapped (Dkt. No. 54 at ¶ 75).[6]  Ms. Cruz asked Plaintiff to provide a letter from her therapist supporting her need to have an office of her own (Dkt. No. 57 at ¶ 57; Dkt. No. 65 at ¶ 20).  On October 24, 2017, Plaintiff provided another note from Ms. Santiago (Dkt. No. 54 at ¶¶ 58-59; Dkt. No. 65 at ¶ 21).  The note stated:

> I am writing this letter on behalf of my client Jenifer Rivera. Jenifer is receiving services in our clinic due to depression and anxiety.  Jenifer has requested a special accommodation at work in order to maintain a stability and productivity.
>
> Jenifer responds well in terms of concentration and performance; to environments where there are less people around her, closed and crowded spaces could triggers anxiety.  If you have any questions do not hesitate to contact us at 532-0389.  Thanks

(Dkt. No. 54 at ¶ 58; Dkt. No. 65 at ¶ 21; Dkt. No. 47-9; Dkt. No. 51-5).  While Defendant maintains that this note did not support Plaintiff's contention that she needed an office of her own or an office with a window, it is undisputed that Plaintiff was permitted to continue using

---

[5] Defendant moves to strike paragraph 24 of Plaintiff's statement of facts for the same reason that it moves to strike paragraph 55.  The court declines to strike paragraph 24, following the same rationale as is outlined in reference to paragraph 55.

[6] Defendant moves to strike paragraph 75 of Plaintiff's statement of facts, arguing that it sets forth Plaintiff's "opinion of what Ms. Cruz 'believed' or 'knew,'" and that Plaintiff's "interpretation of this testimony is not admissible" (Dkt. No. 60 at 6).  Defendant also contends that Ms. Cruz's deposition testimony is only admissible as facts of which Ms. Cruz had personal knowledge (Dkt. No. 60 at 6).  The court declines to strike paragraph 75.  The paragraph itself consists of language quoted directly from Ms. Cruz's deposition, not Plaintiff's interpretation of that testimony.  Further, Defendant fails to explain why Ms. Cruz would not have personal knowledge of what Plaintiff said to her.

Ms. Lubega's office with a window for nearly another year (Dkt. No. 54 at ¶ 60; Dkt. No. 65 at ¶ 23).

In July 2018, Ms. Morales told Ms. Lubega that Plaintiff had been complaining about her pay, and Plaintiff asked for a raise (Dkt. No. 65 at ¶ 24).  Ms. Lubega gave Plaintiff a raise so that she would stay with the company (Dkt. No. 65 at ¶ 24).  In September 2018, Plaintiff started school part-time at Holyoke Community College (Dkt. No. 65 at ¶ 32).  She was permitted to work part-time and create her own schedule to accommodate her school schedule and therapy appointments (Dkt. No. 65 at ¶ 32).

Also in September 2018, an employee who had covered the "front desk" left Defendant's employ, and Plaintiff and another employee, Leah Gara, were assigned to cover the front desk (Dkt. No. 54 at ¶ 104; Dkt. No. 65 at ¶ 25).  The front desk was located in the "receptionist office," which had three windows, one of which was to the outside (Dkt. No. 65 at ¶¶ 26, 39).  Plaintiff continued in her role performing quality assurance for home health aides, but she assumed some new responsibilities associated with the front desk, including allowing visitors into Defendant's locked offices (Dkt. No. 54 at ¶ 107-08; Dkt. No. 65 at ¶¶ 30-31).  When someone rang the doorbell, Plaintiff was required to identify who was at the door, which she could do by intercom, and, if appropriate, buzz the person in (Dkt. No. 65 at ¶ 30).  When the doorbell or buzzer was not working, Plaintiff would have to get up to allow the visitor in (Dkt. No. 65 at ¶ 30).  The locked door had a window through which Plaintiff could see who was at the door (Dkt. No. 65 at ¶ 26).  Plaintiff also began receiving mail, getting Ms. Cruz when medications arrived, and handing out paperwork to those seeking employment (Dkt. No. 65 at ¶ 31).

The front desk environment was loud and noisy.  The first floor of the building also housed the Bowen Center, a resource center for the homeless, and a lot of people would hang out in the hallways knocking on the doors trying to get into Defendant's offices (Dkt. No. 54 at ¶ 109).  In addition, at least three times when Plaintiff was in the receptionist office, a fight or argument broke out in the hallway outside Defendant's locked offices (Dkt. No. 65 at ¶ 33).  On one occasion, Ms. Cruz said she was going to call the police because there was an argument, although Plaintiff does not recall whether she was working in the receptionist office at the time this occurred (Dkt. No. 65 at ¶ 33).  According to Plaintiff, the symptoms of her mental health conditions worsened while she was working in the receptionist office (Dkt. 51-22 at ¶ 42).  Plaintiff maintained that she needed an office with a window and that she had to go back to Ms. Lubega's office, but Ms. Lubega would not allow it (Dkt. No. 65 at ¶¶ 36-37).  The office next to Ms. Lubega's, which, however, did not have a window, remained available to Plaintiff (Dkt. No. 65 at ¶ 38).

Plaintiff asked her therapist to write another letter supporting her need for an accommodation because she was miserable working in the receptionist office (Dkt. No. 54 at ¶ 116).  Ms. Santiago drafted a letter dated November 20, 2018, stating:

> I'm writing this letter on behalf of my client Jenifer Rivera. Jenifer is receiving services in our clinic due to depression an anxiety.  Jenifer has requested a special accommodation at work in order to maintain a stability and productivity.
>
> Jenifer responds well in terms of concentration and performance[ ] to environments where there are less people around her, closed and crowded spaces could triggers anxiety.  Jennifer has reported that working in her current position has exacerbate symptoms. If you have any questions do not hesitate to contact us at 532-0389. Thanks

(Dkt No. 54 at ¶ 117; Dkt. No. 65 at ¶ 42; Dkt. No. 47-12; Dkt. No. 51-6).  Plaintiff provided the note to Ms. Morales, and Ms. Morales forwarded it to Ms. Lubega on November 23, 2018 (Dkt. No. 54 at ¶¶ 119-121; Dkt. No. 65 at ¶ 42).  Ms. Morales stated:

> Attached you will find a letter from Jennifer Rivera's Therapist. She has requested to go back to her confined space in the office she was currently in before moving to the front desk.  The front desk job was not something she agreed to doing permanently, it was just temporary until someone was hired for that position. However, she did not expect it to be this long.

(Dkt. No. 54 at ¶ 119; Dkt. No. 65 at ¶ 42; Dkt. No. 47-13; Dkt. No. 51-12).  Later that same day, Ms. Lubega emailed Ms. Morales that Plaintiff could change offices with Najib or Giana (Dkt. No. 54 at ¶ 124; Dkt. No. 65 at ¶ 43; Dkt. No. 47-13; Dkt. No. 51-12).  Plaintiff refused both offices.  She refused Najib's office because she believed it was a supply room with a very small desk in it; she refused Giana's office because it had no window (Dkt. No. 65 at ¶ 46). Plaintiff was also offered the opportunity to work out of the conference room as it was not used on a regular basis, but Plaintiff refused this offer as well.  The conference room had exterior windows on two of its walls (Dkt. No. 65 at ¶ 47).

On November 29, 2018, Ms. Lubega asked Ms. Rivera to sign her timesheets and have Medical Records Manager Charity Nhire co-sign them before sending them to payroll (Dkt. No. 54 at ¶ 183; Dkt. No. 65 at ¶ 58).  Defendant maintains that Ms. Lubega believed that Plaintiff might have been leaving without punching out and returning later in the day and, thus, was being paid for time that she was not at work and that Ms. Cruz might be covering for Plaintiff (Dkt. No. 65 at ¶¶ 52, 57).  According to Defendant, Ms. Lubega decided to conduct an investigation to find out whether Plaintiff was inaccurately reporting her time (Dkt. No. 65 at ¶ 54).  Plaintiff disputes the impetus for Ms. Lubega's actions and notes that, prior to that date, no one at Defendant had ever spoken to her about her time sheet or attendance (Dkt. No. 54 at ¶ 184).  In

any event, Ms. Lubega subsequently learned that Plaintiff was very upset that she was required to have Ms. Nhire sign her timesheets, and Ms. Lubega discontinued the investigation without any further action (Dkt. No. 65 at ¶ 58).

On January 4, 2019, Plaintiff emailed Defendant's Human Resources department a Family and Medical Leave Act ("FMLA") Certification of Healthcare Provider form ("CHP") that Ms. Santiago had completed on December 17, 2018 (Dkt. No. 65 at ¶¶ 60-61).  In the CHP, Ms. Santiago stated:

> Jennifer suffers from PTSD and Panic attacks that are exacerbated
> by being in closed spaces, stressful situations.  Would be helpful
> for Jeniffer to have time to calm when feeling overwhelmed and to
> work in open spaces.

(Dkt. No. 54 at ¶ 156; Dkt. No. 65 at ¶ 60; Dkt. No. 47-15; Dkt. No. 51-15).  Ms. Santiago also stated that Plaintiff would benefit from "open space," a "modified break schedule," and a "flexible schedule" (Dkt. No. 65 at ¶¶ 60-61; Dkt. No. 47-15; Dkt. No. 51-15).  Plaintiff stated that she needed four weeks of leave (Dkt. No. 65 at ¶ 61).  Ms. Lubega called Plaintiff about her request for leave (Dkt. No. 54 at ¶ 157).  During that call, Plaintiff requested that she be given an office with a window that was located in the prior authorization department area on the second floor of the building, where Defendant would be moving in a few days (Dkt. No. 54 at ¶ 158; Dkt. No. 54 at ¶ 148).  Ms. Lubega refused to allow Plaintiff to use that office on the basis that it had already been assigned to another employee, although he did not begin working in that office for two or three months (Dkt. No. 54 at ¶¶ 150, 152, 159).  Ms. Lubega signed Plaintiff's FMLA form (Dkt. No. 54 at ¶ 159).

Three days later, on January 7, 2019, Altranais's offices moved from the first floor to the second floor of the building (Dkt. No. 54 at ¶ 131; Dkt. No. 65 at ¶ 62).  Plaintiff's leave did not commence until January 10, 2019, so she worked out of the new "reception office" assigned to

her on the second floor for one or two days (Dkt. No. 54 at ¶ 160; Dkt. No. 65 at ¶¶ 62, 67).

Plaintiff rejected working out of three other rooms on the second floor, including a private office

near the waiting area that did not have a window and had desks for two people, the conference

room which has multiple windows, and a large space also with multiple windows that had

cubicles for multiple employees but was used by only one other employee (Dkt. No. 54 at ¶¶

141-142, 144; Dkt. No. 65 at ¶¶ 64-66).  Defendant used the conference room for regular nurses'

meeting and trainings, and the room was also used to get from one part of the building to another

(Dkt. No. 54 at ¶ 145-146).  The room with the cubicles was in the human resources department

and housed files that needed to be accessed (Dkt. No. 54 at ¶ 141).

On January 23, 2019, Plaintiff contacted Ms. Morales and told her that she wanted to

return to work but did not want to sit at the front desk (Dkt. No. 54 at ¶¶ 161-162; Dkt. No. 65 at

¶ 72).  Ms. Morales emailed Ms. Lubega:

> I forgot to mention at work that Jennifer had reached out to me
> today saying that she wants to come back to work tomorrow and
> was asking if we can accommodate her request to have her sit back
> in a office space thats not the front desk??  When she was ask to
> cover at the front desk she thought it was temporary until a person
> was hired for the job of receptionist.  She was placed on FMLA by
> her therapist starting 1/10/19 for upto 30 days due to the stress and
> being overwhelmed at work.  So my question is, can we
> accommodate Jen?  Please let me know.

(Dkt. No. 54 at ¶ 164; Dkt. No. 65 at ¶ 70; Dkt. No. 47-17; Dkt. No. 51-14).  Ms. Lubega

responded to Ms. Morales stating:

> Jennifer should bring a letter from her Provider that she is okay to
> come back to work without restrictions
>
> Because we received a letter that she is not okay to work

 (Dkt. No. 54 at ¶ 165; Dkt. No. 65 at ¶ 73; Dkt. No. 47-18; Dkt. No. 51-16).  Five days later, on

January 28, 2019, Plaintiff submitted a letter of resignation stating:

As you know, I've been diagnosed with PTSD, anxiety and depression, as a result of witnessing my partner's murder. These conditions were under control for the last year when I was working in my own office. Then you assigned me to work as a receptionist, where there are a lot of people around me, which triggers my anxiety.

You have never had a complaint against me or my job performance. Several times either I, my supervisor or my therapist have asked you to accommodate my disability by allowing me to work in an office, where there are less people around me. I was assigned an office by myself by Keyla Cruz in the summer of 2017. After that, you asked Keyla Cruz to move me into another office with a coworker stating that the office I was working in was yours. That made no sense because you never used that office at Altranais Home Care offices. When you moved me to the receptionist desk, Stephanie started working in that office.

I have given the Human Resources Department 2-3 letters asking you to please let me continue doing my work in my office. Instead, you make me work at the receptionist's desk (which was never my job), where the environment triggers my anxiety. I don't understand why, but you refuse to let me use my office. By the beginning of January 2019 all staff moved from the first floor to the second floor and I hoped that I was going to work in an office by myself as I and my therapist explained how important it was for me to work in my own office. There are 3 empty offices at the new location and you denied my petition to work in one of them; even though there is at least one available and other people (Leah Gara) whose job is like mine have their own office.

My therapist said I could return to work in an office of my own. You have asked for a letter saying I could return with no restrictions. But my therapist has already said that I cannot return without restrictions.

My health is suffering. Since you're not going to let me do my job in an office, I have no choice but to quit. I tried my best, but I just can't continue to do this. I have no other choice but to quit my job at Altranais Home Care.

(Dkt. No. 54 at ¶¶ 166-167;[7] Dkt. No. 65 at ¶ 74; Dkt. No. 47-19; Dkt. No. 57-17).  The

following day, Ms. Lubega sent two emails to Ms. Morales and others.  The first email stated:

> Jeniffer Abandoned her Job responsibilities.  Altranais Home Care
> needs and relies on its employees to complete day to day tasks.
>
> She was the only person doing HHA Quality Assurance in
> Springfield and abandoned her responsibilities.  Who has been
> doing HHA QA for Springfield.  Is Jeniffer supposed to return to
> work when she wants to.
>
> My decisions are made on how the employee productivity is.
>
> Jeniffer did not need her own office based the tasks that were
> assigned to her.
>
> Jennifer will not be assigned to Prior Authorization as she had
> requested due lack of her poor commitment to work/Altranais.
>
> This I have seen on a daily basis.
>
> If Jeniffer want to return to work she can have the office next to
> Leah.  Jeniffer needs to bring a letter from her health care provider
> stating she is able to work.

(Dkt. No. 54 at ¶ 169; Dkt. No. 65 at ¶ 76; Dkt. No. 47-20; Dkt. 51-18).  In the second email,

Ms. Lubega wrote:

> Additionally to my respond per Ms. Rivera; Its more important, for
> employees to work hard and through their hard work, they get
> promotions and raise.
>
> Ms. Rivera has been demanding for Office space, demanding for
> raise.  If you don't give me a raise, I quit.  If you don't give me
> office space I quit.  If I don't work with prior Auth department,
> then sign my FMLA.

---

[7] Defendant has moved to strike paragraph 167 of Plaintiff's statement of facts, which quotes
Plaintiff's resignation letter in full, and asks that the court disregard the contents of the letter on
the ground that the letter constitutes hearsay.  *See* Fed R. Evid. 801(c).  The court agrees that to
the extent Plaintiff would offer the letter to prove the truth of the matters asserted therein, it
would violate the rule against hearsay.  See Fed. R. Evid. 801(c), 802.  However, the letter is
admissible and will be considered as evidence of the fact that Plaintiff resigned and what she
communicated to Defendant upon her resignation.

These are conditions, requirements that have been stated by Ms. Rivera. She has been presenting letters from Physicians and Counselors. I believe we have tried to accommodate Ms. Rivera.

It is a privilege for employees to be employed at Altranais Home Care because it is a safe working environment.

Ms. Rivera has been very demanding, with her requests, and this has been affecting her productivity and attendance.

We have even accommodated Ms. Rivera's work schedule, last semester and she picked the days and hours she could work.

Ms. Rivera picked her own schedule but sometimes, she wouldn't come to work as she had stated. These are complaints that I have brought to you via phone call.

I instructed the Medical Records Manager to sign her attendance sheet so that we can clarify her work schedule but most of the time, she would not take the attendance sheet to the Manager.

When I reviewed payroll, it would reflect that she worked, even though her attendance sheet was not signed or was never handed to the Medical Records manager to sign and confirm her attendance. Ms. Rivera was aware that she supposed to get her time sheet signed by the medical records manager.

Ms. Rivera did get the raise that she demanded for and the work schedule, that she had requested for. Ms. Rivera did get the receptionist office.

At hire, Ms. Rivera was not promised that she would get an office with the window or by her self.

Since she is an office clerk, her duties were subject to change from time to time, based on the office need and this applies to all office clerks at Altranais Home Care, LLC.

I'm not sure of what intentions Ms. Rivera has with the multiple documentation she has been presenting but it is a concern.

This email will be forwarded to Ms. Rivera through Axxess and Ana please make sure Ms. Rivera sees this email.

Hr will be filing this in her records.

15

(Dkt. No. 54 at ¶ 170).

Ms. Lubega and Mr. Ogutt told Ms. Morales that they wanted to discuss the reason for Plaintiff's resignation to see if there was anything they could do because they wanted her to remain in her job (Dkt. No. 65 at ¶ 78). Ms. Lubega and Mr. Ogutt asked Plaintiff to meet with them, which she did, along with Ms. Morales who acted as a translator (Dkt. No. 54 at ¶ 171; Dkt. No. 65 at ¶ 79). At the meeting, Ms. Lubega told Plaintiff that they had offered her several offices, but she had rejected them all (Dkt. No. 54 at ¶ 172). Mr. Ogutt and Ms. Lubega refused to offer Plaintiff the office with the window in the prior authorization area on the second floor (Dkt. No. 54 at ¶ 173). Ms. Lubega told Plaintiff that she needed to "work hard" to get the office she needed (Dkt. No. 54 at ¶ 174). Ms. Morales recalled Plaintiff being offered the office next to Ms. Gara, but she refused it (Dkt. No. 54 at ¶ 171; Dkt. No. 65 at ¶¶ 77, 80). Mr. Ogutt and Ms. Lubega did not discuss Plaintiff's disabilities or her need for an office with a window (Dkt. No. 54 at ¶ 176).

In all the time that Plaintiff worked for Defendant, neither Mr. Ogutt nor Ms. Lubega ever met with Ms. Rivera to discuss her disabilities or ask why she needed an office with a window (Dkt. No. 54 at ¶¶ 127, 129). Nor did they ask to speak to Ms. Rivera's therapist (Dkt. No. 54 at ¶¶ 127, 129).

After Plaintiff resigned, Defendant did not fill the home health aide quality assurance position because Ms. Lubega determined the position was not needed (Dkt. No. 65 at ¶ 82). Plaintiff's position was intended to save revenue, but after Plaintiff left, there was no loss of revenue (Dkt. No. 65 at ¶ 82). In addition, Mr. Ogutt was in the process of looking for a software program that would improve Defendant's processes and maximize reimbursements (Dkt. No. 65 at ¶ 83). In May 2019, Defendant contracted with Note-e-Fied Incorporated for use

of its "Perfect Home Health Software," which eliminated the need for anyone to perform quality assurance for home health aides (Dkt. No. 65 at ¶ 83).

## II.   DISCUSSION

Plaintiff asserts the following counts in her complaint: (1) disability discrimination in violation of 42 U.S.C. § 12112 (Count One); (2) discrimination based on disability in violation of Mass. Gen. Laws ch. 151B, § 4(16) (Count Two); (3) retaliation in violation of 42 U.S.C. § 12203 (Count Three); and (4) retaliation in violation of Mass. Gen. Laws ch. 151B, § 4(4) (Count Four) (Dkt. No. 1 at ¶¶ 165-186).  Plaintiff asserts that Defendant discriminated against her by failing to reasonably accommodate her, by creating a hostile work environment, and by constructively terminating her employment (Dkt. No. 1 at ¶¶ 167-69, 174-176).  Defendant has moved for summary judgment on all four counts of Plaintiff's complaint.  Plaintiff has moved for partial summary judgment as to liability on Counts One and Two of her complaint for disability discrimination on the failure to accommodate theory only.  The court addresses each of the counts and theories in turn.

A. Disability Discrimination

*1. Failure to Reasonably Accommodate*

Plaintiff contends that Defendant violated the ADA by failing to reasonably accommodate her disability.  The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified ... employee, unless [the employer] can demonstrate that the

accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C.

§ 12112(b)(5)(A).  To establish a claim for failure to reasonably accommodate, "a plaintiff must

produce sufficient evidence for a reasonable jury to find that (1) [s]he was disabled within the

meaning of the ADA, (2) [s]he was a qualified individual, and (3) the [employer], despite

knowing of the plaintiff's disability, did not reasonably accommodate it."  *Flaherty v. Entergy*

*Nuclear Operations, Inc.*, 946 F.3d 41, 55 (1st Cir. 2019).  These are the same elements that

must be shown to establish a violation of Mass. Gen. Laws ch. 151B, § 4(16).[8]  *See Fiumara v.*

*President & Fellows of Harvard Coll.*, 526 F. Supp. 2d 150, 156 (D. Mass. 2007).  Defendant

concedes, at least for purposes of summary judgment, that Plaintiff satisfies the first two

elements, and, thus, the court turns directly to the third.

To determine whether an employer has failed to provide a reasonable accommodation,

the First Circuit follows the analysis outlined in *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254 (1st

Cir. 2001).  *Enica v. Principi*, 544 F.3d 328, 338 (1st Cir. 2008).   First, the plaintiff must show

"not only that the proposed accommodation would enable her to perform the essential functions

of her job, but also that, at least on the face of things, it is feasible for the employer under the

circumstances."  *Reed*, 244 F.3d at 259.  Next, the plaintiff must prove that she "sufficiently

requested the accommodation in question."  *Reed*, 244 F.3d at 260.  To meet this standard, the

plaintiff's request "(1) 'must be "sufficiently direct and specific,"' and (2) 'must explain how the

accommodation requested is linked to some disability.'"  *Freadman v. Metro. Prop. & Cas. Ins.*

---

[8] Massachusetts state law refers to an individual's "handicap" rather than "disability," but there
is "no substantive difference between the two terms," and they may be used "interchangeably."
*Miceli v. JetBlue Airways Corp.* 914 F.3d 73, 80 (1st Cir. 2019).  Moreover, the Supreme
Judicial Court (SJC) "'look[s] to the Federal cases decided under the ADA as a guide to the
interpretation of [chapter] 151B.'"  *Id*. at 81 (quoting *Russell v. Cooley Dickinson Hosp., Inc.*,
772 N.E.2d 1054, 1061 n.5 (Mass. 2002)).  While "the SJC has, on occasion, departed from
federal law in the area of disability discrimination," *id*. (citations omitted), the parties treat the
federal and state claims as identical, and the court will do the same.

*Co.*, 484 F.3d 91, 102 (1st Cir. 2007) (quoting *Reed*, 244 F.3d at 261).  The defendant then "may attempt to prove that, in fact, the proposed accommodation was not feasible and would constitute an 'undue hardship.'" *Calero-Cerezo v. Dep't of Justice*, 355 F.3d 6, 23 (1st Cir. 2004) (citing *Reed*, 244 F.3d at 261).

"Under the third element, an employer's request for accommodation sometimes creates 'a duty on the part of the employer to engage in an interactive process.'" *E.E.O.C. v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2017) (footnote omitted) (quoting *Enica*, 544 F.3d at 338).  Both the employer and the employee have an obligation to engage in this process in good faith. *Kohl's Dep't Stores*, 774 F.3d at 132.  "The employer has an obligation upon learning of an employee's disability to 'engage in a meaningful dialogue with the employee to find the best means of accommodating that disability.'" *Freadman*, 484 F.3d at 104 (quoting *Tobin v. Liberty Mut. Ins. Co.,* 433 F.3d 100, 108 (1st Cir. 2005)).  "The employee also has an obligation: 'The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability.'" *Id.* (alteration in original) (quoting 29 C.F.R. pt. 1630, app. § 1630.9; *see also Calero-Cerezo*, 355 F.3d at 24).  "Although the degree of interaction required varies in accordance to the circumstances of each case, the process requires open communication by both parties, and an employer will not be held liable if it makes 'reasonable efforts to both communicate with the employee and provide accommodations based on the information it possessed ….'" *Enica*, 544 F.3d at 339 (alteration in original) (quoting *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 28 (1st Cir. 2001)).  A refusal to give a requested accommodation does not by itself amount to bad faith, "so long as the employer makes an earnest attempt to discuss other potential reasonable accommodations." *Together Emps. v. Mass Gen. Brigham Inc.*, No. CV 21-11686-FDS, 2021 WL 5234394, at *14 (D. Mass.

Nov. 10, 2021). "Once 'a breakdown in the process has been identified, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary."'" *Ortiz-Martinez v. Fresenius Health Partners, PR, LLC*, 853 F.3d 599, 605 (1st Cir. 2017) (quoting *Enica*, 544 F.3d at 339). "Though the issue of good faith is relevant in examining the interactive process, a showing of discriminatory intent or animus is not required in cases alleging a failure to accommodate." *Enica*, 544 F.3d at 339 (citing *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999)).

Defendant does not dispute that allowing Plaintiff to work from a private office with a window would have enabled her to perform the essential functions of her job, nor does Defendant claim that it was not feasible or would have constituted an undue burden. Thus, summary judgment for Defendant is appropriate only if a reasonably jury must conclude that Defendant provided a reasonable accommodation, *see Rennie v. United Parcel Serv.*, 139 F. Supp. 2d 159, 167 (D. Mass. 2001), or that Defendant engaged in the interactive process in good faith while Plaintiff failed to do so, *see Ortiz-Martinez*, 853 F.3d at 605 (citing *Enica*, 544 F.3d at 339). Summary judgment for Plaintiff, on the other hand, is appropriate only if a reasonable jury must conclude that Defendant failed to participate in the interactive process in good faith or failed to make efforts to explore reasonable accommodations. *Enica*, 544 F.3d at 339.

Plaintiff's theory of liability is that Defendant granted her an accommodation in late July or early August 2017, when Defendant allowed her to move from the office that she was sharing with Denisha into the office with a window that had been assigned to Ms. Lubega. Then, in August 2018, Defendant unilaterally revoked that accommodation by requiring Plaintiff to sit in the receptionist office. Even when Plaintiff presented a letter from her therapist on November

20, 2018, indicating that working in her current position was exacerbating her symptoms and repeating that she would "respond well in terms of concentration and performance[ ] to environments where there are less people around her," and that "closed and crowded spaces" could trigger anxiety, Defendant failed to return her to the office with a window where she had been working and instead only offered her two other offices that lacked windows. And when Defendant moved its offices from the first floor to the second, Defendant once again refused to accommodate Plaintiff by assigning her to a windowless office, making her work out of the receptionist office, and refusing to allow her to work in the office with a window located in the prior authorization area.

In support of her revocation theory, Plaintiff relies on *Isbell v. John Crane, Inc.*, 30 F. Supp. 3d 725 (N.D. Ill. 2014). In *Isbell*, the plaintiff took medications every morning for Adult Attention Deficit Disorder and Bipolar Disorder, which did not kick in until several hours after ingestion. *Id*. As a result, the plaintiff struggled to arrive for her scheduled start time of 8:30 a.m., and the defendant allowed the plaintiff to begin her workday at 10:00 a.m. *Id*. This arrangement lasted for two-and-a-half years, until new management established a uniform start time of 8:30 a.m. for all employees in the lab in which the plaintiff worked. *Id*. The plaintiff objected to the change and provided a letter from her treating physician indicating that a start time of 10:00 a.m. would be "optimal," after which the defendant informed the plaintiff that she would be accommodated with a new start time of 9:15 a.m. *Id*. The *Isbell* court faulted the parties for focusing their attention on the question of whether a 9:15 a.m. start time was reasonable in their cross-motions for summary judgment. *Id*. Instead, the court explained that "[b]ecause [the defendant] had already made a reasonable accommodation a few years earlier when it permitted [the plaintiff] to start her work day at 10 a.m., the question bec[ame] instead

whether it was reasonable for [the defendant] to withdraw that existing accommodation." *Id*. at 734.  The court concluded that "[w]ithout evidence that [plaintiff's] later timetable was placing an undue burden on [the defendant], the answer to that question is plainly 'no.'" *Id*.  Moreover, "[e]ven if the record contained a material suggestion that her later start time was making it difficult for her to meet [the defendant's] reasonable expectations … [the defendant's] obligation under the ADA was to work with [the plaintiff] to adjust the existing accommodation in an attempt to correct those problems, not simply to alter the accommodation to her detriment." *Id*.  According to Plaintiff, Defendant had the same obligation as the defendant in *Isbell* – to work with Plaintiff to adjust the existing accommodation or retain it rather than revoking it unilaterally.

Defendant counters with the theory that it attempted to engage in the interactive process with Plaintiff, but that Plaintiff steadfastly refused to try any of the numerous workspaces it offered to her, despite the fact that they were consistent with her therapist's recommendations. Instead, Plaintiff insisted that the only offices in which she could work were Ms. Lubega's office on the first floor and the office with a window in the prior authorization area on the second floor. According to Defendant, Plaintiff did not tie her requests for particular offices with windows to her disability, leaving Defendant with the impression that it was simply her personal preference that she have those two offices.  In addition, Defendant cites to *Bryant v. Caritas Norwood Hosp.*, 345 F. Supp. 2d 155, 170 (D. Mass. 2004), for the proposition that Plaintiff was not entitled to the accommodation of her choosing instead of other reasonable accommodations offered, and to *Kohl's Dep't Stores*, 774 F.3d at 127, to argue that Plaintiff's failure to consider alternate accommodations is fatal to her claim because it represented a refusal to engage in the interactive process in good faith.

This court concludes that neither side is entitled to summary judgment on Plaintiff's failure to accommodate theory.  Neither Plaintiff's nor Defendant's theory is borne out by the summary judgment record.  Plaintiff's revocation theory is premised on the argument that she was accommodated within the meaning of the ADA in late July or early August 2017, when she was permitted to move into the office that had been assigned to Ms. Lubega, which happened to have a window.  However, according to the record, at that time, Plaintiff simply asked Ms. Cruz if she could move to an office of her own.  There is no evidence in the record that Plaintiff requested that she be moved into an office with a window or that she explained how her request for a private office was linked to her mental health conditions as would be required to trigger a duty of reasonable accommodation on the part of Defendant under the ADA.  *See Freadman*, 484 F.3d at 102 (quoting *Reed*, 244 F.3d at 261) (noting that the plaintiff's request "(1) 'must be "sufficiently direct and specific,"' and (2) 'must explain how the accommodation requested is linked to some disability.'").

It was not until Plaintiff was asked to move from Ms. Lubega's office into the windowless office next to Ms. Lubega's, and she refused, that Ms. Cruz asked Plaintiff to bring in a letter from her therapist.  Plaintiff provided Defendant with the October 24, 2017, letter from Ms. Santiago advising Defendant that Plaintiff suffered from depression and anxiety and stating that she would respond well to "environments where there are less people around her" and that "closed and crowded spaces could trigger[ ] anxiety."  Thus, by this date, Plaintiff's request for a particular type of office environment was linked to her disability, but the precise accommodation Plaintiff required was ambiguous.  It is not necessarily the case that an environment with "less people around" means a private office or that an office without a window is always equivalent to a "closed" space.  Plaintiff may have told Ms. Cruz that the lack of a window made her feel

trapped, but Ms. Santiago's letter does not clearly communicate that Plaintiff's depression and anxiety necessitated that she be assigned to a private office with a window. Thus, the letter, rather than requiring that Plaintiff be allowed to remain in Ms. Lubega's office absent an undue burden (which Defendant does not claim), simply triggered Defendant's duty to engage in the interactive process to determine an appropriate reasonable accommodation.

Defendant responded by allowing Plaintiff to remain in Ms. Lubega's office until September 2018, when Plaintiff was moved to the receptionist office. The record is silent whether there was any communication between Plaintiff and Defendant leading up to this move. There is certainly no indication that Plaintiff objected to it at the time, which differentiates this case from *Isbell*, as the plaintiff in that case immediately objected to the reimposition of an 8:30 a.m. start time. *Isbell*, 30 F. Supp. 3d at 730. Nor is it patently obvious that the receptionist office was an environment at odds with what Ms. Santiago had prescribed. Even attributing Plaintiff's interpretation in this litigation of a non-closed space as being a space with a window, the reception office had three windows, one of which was to the outside. And as to the number of people around, it is not an inevitable conclusion that the receptionist office would be too "crowded" or result in there being too many people around Plaintiff. While it is undisputed that a lot of people would congregate in the hallway outside of the locked office, that does not require a conclusion that the office itself was crowded. Moreover, there is no indication that Plaintiff complained about the environment until she provided Ms. Santiago's November 20, 2018, letter indicating that Plaintiff had reported that "working in her current position [was] exacerbate[ing her] symptoms." When Plaintiff did provide the November 20, 2018, letter, Defendant immediately responded by offering Plaintiff the opportunity to switch offices with two other employees. However, Plaintiff refused the two offices, one because she believed it was a supply

closet with a desk in it and the other because it had no window.  Again, Plaintiff faults Defendant because each of the two offices lacked windows but, so far as appears from the record, the necessity of a window had never been unambiguously communicated to Defendant by a healthcare provider.[9]

Finally, when Defendant's offices moved from the first floor to the second, Plaintiff was offered multiple workspaces that at least arguably met Ms. Santiago's specifications, including, a private office near the waiting area that did not have a window and a large space that had multiple windows and cubicles for multiple employees, but in which only one other employee would be working.  Additionally, after her resignation, Plaintiff was offered the windowless office next to Ms. Gara, but she refused it.  Again, it cannot be concluded with certainty that an environment with "less people around" means only a private office or that a windowless office is always equivalent to a "closed" space.  Thus, Plaintiff has not made out a case of the unilateral withdrawal of the only possible reasonable accommodation that would have worked for her as appears to have been the case in *Isbell*.  A reasonable jury could conclude that Plaintiff was reasonably accommodated in accordance with her therapist's specifications.

Defendant's theory, on the other hand, that Plaintiff did not tie her requests for Ms. Lubega's office on the first floor and the office with a window in the prior authorization area on

---

[9] Plaintiff places significant weight on certain deposition testimony of Ms. Lubega, which Plaintiff interprets to mean that Ms. Lubega knew Plaintiff needed an office with a window to accommodate her mental health conditions.  The testimony in question was Ms. Lubega's negative response to being asked, "Did you doubt that Ms. Rivera needed an office with a window?" (Dkt. No. 47-3 at 27).  However, the meaning of Ms. Lubega's response is not so clear as Plaintiff would have it, coming on the heels of Ms. Lubega's testimony that "[t]he therapist told me she needed to be in a certain environment and I gave her what a certain environment the therapist had requested" (Dkt. No. 47-3 at 27).  Ms. Lubega also testified that if she had believed that Plaintiff needed an office with a window, she would have given her one, which at least implies she did not believe Plaintiff needed an office with a window as an accommodation (Dkt. No. 47-3 at 27).

the second floor to her disability flies overlooks the two letters from Ms. Santiago clearly communicating that Plaintiff suffered from anxiety and depression and had asked for an accommodation in the workplace.  Again, the letters were ambiguous, but to argue that Plaintiff's request for a particular type of working environment was not sufficiently tied to her disability is not supported by the undisputed facts.  Further Defendant makes much of testimony from Plaintiff that she did not consider an office with the door ajar to be a closed space (Dkt. No. 47-4 at 12), arguing that because Plaintiff could have left the door to any of the offices she was offered open, she was accommodated exactly as her therapist indicated.  However, this testimony does not bear the weight Defendant attempts to place on it.  This is because it came on the heels of Plaintiff's testimony that she considers an office to be a closed space if there are no windows (Dkt. No. 47-4 at 12).  Thus, Plaintiff's testimony on this point is ambiguous and cannot support an award of summary judgment in Defendant's favor.  A jury may find Defendant's interpretation persuasive, but it does not compel a finding that Defendant reasonably accommodated Plaintiff.

Moreover, even if a reasonable jury were to find that Plaintiff was not reasonably accommodated, there are material questions of fact regarding which side is responsible for the breakdown in the interactive process.  Defendant acknowledges that when it requested documentation from Plaintiff's therapist, it was engaged in the interactive process with Plaintiff. As Defendant argues, there was nothing improper about it requesting medical documentation to support Plaintiff's claimed need for a private office with a window.  However, the letters provided by Plaintiff's therapist were ambiguous about what precisely Plaintiff needed.  They could be read to support Plaintiff's claimed need for a private office (i.e., not crowded) with a window (i.e., not closed) but are not necessarily read as communicating that need.  Defendant's

argument is essentially that Plaintiff is responsible for the breakdown in the interactive process because it requested documentation, and the documentation Plaintiff provided did not explicitly support the need for the accommodation she had requested.  However, both letters invited Defendant to reach out to Plaintiff's therapist with additional questions, and Defendant did not do so.  Nor did Plaintiff reach out to her therapist for a more specific letter.  "[I]f there is a dispute between the parties as to whether the breakdown in the interactive process was caused by the employee's failure to produce medical reports or the employer's failure to ask for them, the factual dispute must be resolved by a factfinder, which precludes summary disposition." *Willinghan v. Town of Stonington*, 847 F. Supp. 2d 164, 189 (D. Me. 2012) (citing *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 113-14 (2d Cir. 2001)).  That is precisely the situation here.

In addition, whether a party acted in good faith is a question of fact.  *Rennie*, 139 F. Supp. 2d at 168.  Reasonable factfinders could find that Defendant's offer of multiple, alternate workspaces, particularly in combination with the other accommodations it allowed Plaintiff (time off, a flexible schedule, and a modified break schedule) fulfilled Defendant's good faith interactive process obligations.  "The refusal to grant the specific accommodation requested by a plaintiff does not necessarily amount to bad faith, so long as the employer makes an earnest attempt to discuss other potential reasonable accommodations."  *Goodrich v. WellPoint, Inc.*, No. 2:14-CV-00037-JDL, 2015 WL 4647907, at *8 (D. Me. Aug. 5, 2015) (citing *Kohl's Dept. Stores,* 774 F.3d at 133).  On the other hand, Plaintiff has presented evidence from which a jury might conclude that Defendant was not acting in good faith.  For example, Ms. Lubega and Mr. Ogutt, who had no training in the ADA, never personally spoke to Plaintiff about her disabilities, including in the meeting following her resignation.  Nor did they reach out to Ms. Santiago for

clarification of the type of environment Plaintiff needed in order to be reasonably accommodated.  Ms. Lubega also made various statements from which a jury might infer evidence of bad faith (e.g., she complained to Ms. Cruz about Plaintiff occupying her office, she indicated that her "decisions are made on how employee productivity is" and wrote that "Jennifer did not need an office of her own based [on] the tasks that were assigned to her" and that "Ms. Rivera has been very demanding, with her requests, and this has been affecting her productivity and attendance").  In sum, the question of good faith calls for credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, thus warranting a jury trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998).

### 2.   Hostile Work Environment

Plaintiff contends that Defendant violated the ADA and Chapter 151B by creating a hostile work environment.  "The First Circuit has recognized that a hostile work environment tolerated by the employer is cognizable as an adverse employment action," *Echevarria v. AstraZeneca, L.P.*, 133 F. Supp. 3d 372, 404 (D.P.R. 2015) (citing *Quiles-Quiles v. Henderson*, 439 F.3d 1, 8 (1st Cir. 2006); *Noviello v. City of Boston*, 398 F.3d 76, 89 (1st Cir. 2005)), because it amounts to "a change in the 'terms and conditions of employment'" proscribed by the ADA.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting 42 U.S.C. § 12112(a)).  *See also Brader v. Biogen Inc.*, 983 F.3d 39, 59 (1st Cir. 2020) (citing *Murray v. Warren Pumps, LLC,* 821 F.3d 77, 86 & n.1 (1st Cir. 2016)) ("[A] plaintiff may demonstrate an ADA violation by establishing that an employer required him or her to work in a hostile or abusive environment on account of their disability.").

"In order to prove disability-based harassment by means of a hostile work environment, Plaintiff must show that she was "(1) disabled, (2) that [s]he was subjected to a hostile environment, and (3) that the hostility was directed at [her] because of [her] disability." *Quiles-Quiles*, 439 F.3d at 5. A hostile work environment claim in violation of the ADA requires the plaintiff to show, *inter alia*, that the allegedly discriminatory conduct was "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive work environment." *Murray*, 821 F.3d at 86. "'The challenged conduct must be 'both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the plaintiff in fact did perceive it to be so.'" *Brader*, 983 F.3d at 59 (quoting *Maldonado-Cátala v. Municipality of Naranjito*, 876 F.3d 1, 10 (1st Cir. 2017)). "'There is no mathematically precise test' we can use to determine when this burden has been met, instead, we evaluate the allegations and all the circumstances, considering 'the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance.'" *Carmona-Rivera v. P.R.*, 464 F.3d 14, 19 (1st Cir. 2006) (quoting *Pomales v. Celulares Telefónica*, 447 F.3d 79, 83 (1st Cir. 2006)). "The thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." *Noviello*, 398 F.3d at 92 (citing *Faragher*, 524 U.S. at 788). Critically, "[t]he harassment also must stem from an impermissible motivation." *Brader*, 983 F.3d at 59 (citing *Maldonado-Cátala*, 876 F.3d at 10).

Plaintiff's hostile work environment claim is premised on Defendant's requiring her to work in the receptionist office and Ms. Lubega's alleged "picking on" Plaintiff by making her sign her time sheet and provide it to Ms. Nhire for her review and signature. Viewing the facts in the light most favorable to Plaintiff, the court need not even reach the question of whether this

conduct was sufficiently severe and pervasive as to create an abusive work environment, an unlikely prospect in any event.  This is because Plaintiff has not proffered minimally sufficient evidence from which a jury could infer that Ms. Lubega's alleged harassment of her based on an impermissible motivation.  *See Brader*, 983 F.3d at 60 (quoting *Murray*, 821 F.3d at 83)) ("[A] plaintiff … 'bears the burden of presenting evidence to establish each element under the particular theory' alleged under the ADA.").  "[Plaintiff] does not connect any evidentiary dots as to how [Ms. Lubega's] conduct tends to show [Ms. Lubega] harbored any disability-based discriminatory animus whatsoever towards [Plaintiff]."  *Brader*, 983 F.3d at 63–64.  The court therefore allows Defendant's motion for summary judgment on Plaintiff's hostile work environment theory of disability discrimination.

> ### 3. *Constructive Discharge*

Plaintiff contends that she was constructively discharged as a result of Defendant's failure to accommodate her.  In other words, Plaintiff claims that Defendant's refusal to allow her to continue to work in a private office with a window – when it moved her from Ms. Lubega's office to the receptionist office on the first floor and refused to assign her to a private office with a window on the second floor – harmed her and that under these circumstances, a reasonable person in her position would have felt compelled to resign.

"To establish her prima facie case for wrongful termination based on disability discrimination under either federal or state law, [Plaintiff] must present credible evidence that, at the time of her termination: (1) she was handicapped within the meaning of the statute, (2) she was qualified to perform the essential functions of the job with or without reasonable accommodation, (3) she was terminated or otherwise subject to an adverse action by her employer, and (4) the position she occupied remained open and the employer sought to fill it."

*Ellis v. N. Andover Pub. Sch.*, No. CV 19-11224-NMG, 2021 WL 5040330, at *4 (D. Mass. Oct. 29, 2021) (citing *Piccadaci v. Town of Stoughton*, Civil Action No. 18-10188-RGS, 2019 WL 653146, at *2 (D. Mass. 2019)).  *See also Jacques v. Clean-up Grp., Inc.*, 96 F.3d 506, 511 (1st Cir. 1996); *Dartt v. Browing-Ferris Indus., Inc.*, 691 N.E.2d 526, 528 (Mass. 1998).  "Alleging constructive discharge [as Plaintiff does here] presents a 'special wrinkle' that amounts to an additional prima facie element." *Landrau-Romero v. Banco Popular De P.R.*, 212 F.3d 607, 613 (1st Cir. 2000) (quoting *Sanchez v. P.R. Oil Co.*, 37 F.3d 712, 719 (1st Cir.1994)).  A claim for constructive discharge "typically 'refers to harassment so severe and oppressive that staying on the job while seeking redress – the rule save in exceptional cases – is intolerable.'" *Gerald v. Univ. of P.R.*, 707 F.3d 7, 25 (1st Cir. 2013) (quoting *Lee–Crespo v. Schering–Plough Del Caribe, Inc.*, 354 F.3d 34, 45 (1st Cir. 2003)).  "In other words, work conditions must have been so intolerable that [Plaintiff's] decision to resign was 'void of choice or free will' - that her only option was to quit." *Kohl's Dep't Stores*, 774 F.3d at 134 (quoting *Torrech–Hernández v. Gen. Elec. Co.*, 519 F.3d 41, 50 (1st Cir. 2008)).  "This standard is entirely objective - [courts] do not put weight on the employee's subjective beliefs, "'no matter how sincerely held."'" *Id.* (quoting *Torrech-Hernández*, 519 F.3d at 52).

Defendant maintains that a reasonable person in Plaintiff's position would not have quit but instead would have obtained a note specifying that she needed a private office with a window (if that indeed was the case) and, also, would have attempted to work from the numerous other workspaces offered to her.  Plaintiff's position is that her health was suffering, as evidenced by Ms. Santiago's November 20, 2018, note ("Jennifer has reported that working in her current position has exacerbate[d] [her] symptoms"), and her January 4, 2019, resignation letter ("My health is suffering."), leaving her no choice but to quit.

The issue here is whether Defendant's failure to make reasonable accommodations for Plaintiff alone supports a claim of constructive discharge. Plaintiff cites to three cases that she says support such a claim, but each is distinguishable. First, in *Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099 (6th Cir. 2008), the Sixth Circuit reversed the lower court's grant of summary judgment for the employer on the plaintiff's claim of constructive discharge. *Id*. at 1110. The court found that the plaintiff, who suffered from degenerative osteoarthritis of her cervical and lumbar spine was told that she would not be allowed to use a stool while working, "could reasonably have believed that she would either have to work her entire shift without a stool – conditions she alleges were intolerable due to severe pain – or resign." *Id*. at 1109. However, in finding that the Plaintiff had produced sufficient evidence to create a trial-worthy issue, the court considered not only the defendant's refusal to accommodate the plaintiff, but also the defendant's refusal to read a doctor's note that the plaintiff delivered upon request, failure to organize a meeting to discuss the issue, and failure to contact the plaintiff regarding the status of such a meeting or with other alternatives to resolve the issue. *Id*. at 1109. Second, in *Blickle v. Ill. Dep't of Children & Family Servs.*, No. 12 C 9795, 2013 WL 2467651 (N.D. Ill. June 7, 2013), the district court denied the employer's motion to dismiss the employee's claim of constructive discharge based on its refusal to transfer her to a different location that was closer to where she received therapy for a debilitating back condition. *Id*. at *3. The court noted that "[w]hile [the plaintiff] may be unable to eventually prove that [the defendant] constructively discharged her due to her disability, her allegations are sufficient to withstand a motion to dismiss." *Id*. What Plaintiff fails to point out is that the court later granted summary judgment to the defendant, finding that the plaintiff had not shown that "the conditions of her employment even beg[a]n to approach the intolerable levels required in a constructive discharge case."

*Blickle v. Ill. Dep't of Children & Fam. Srvcs*, No. 12 C 9795, 2015 WL 5693081, at *6 (N.D. Ill. Sept. 28, 2015). Finally, *Johansson v. Prince George's Cty. Pub. Schs.*, Civil Action No. DKC 13-2171, 2014 WL 3345054, (D. Md. July 7, 2014), was another case before the court at the preliminary stage of a motion to dismiss. *Id*. at *1. Moreover, in the Fourth Circuit, a claim of constructive discharge requires proof not only of a failure to accommodate, but also that the employer intentionally sought to drive the plaintiff from the position. The focus of the decision was whether the plaintiff had sufficiently plead deliberateness, and the court found that she had where she alleged that her accommodation was taken from her, she requested a reasonable accommodation, and she was totally rebuffed. *Id*. at *10. Proof of deliberateness is not required in the First Circuit. *See Ramos v. Davis & Geck*, 167 F.3d 727, 732 (1st Cir. 1999) (noting that requiring proof of employer intent "would plainly be at odds with our settled precedent" of applying an objective standard to constructive discharge claims). Thus, *Johansson* is inapposite.

Instead, the court finds persuasive a decision from this district finding that a failure to make a reasonable accommodation usually does not amount to *per se* constructive discharge. *Hurley-Bardige v. Brown*, 900 F. Supp. 567, 574 (D. Mass. 1995). In other words, more than a mere failure to make reasonable accommodation is ordinarily necessary to prove constructive discharge. *Id*. at 573. In *Hurley-Bardige*, the plaintiff, a nurse practitioner in an outpatient clinic, suffered from Meniere's Disease, a chronic affliction of the inner ear that causes abrupt and uneven changes in balance and hearing and that resulted in a severe bilateral hearing loss. *Id*. at 569. Due to her claimed inability to hear heart and lung sounds and occasional vertigo and fainting spells, the plaintiff requested to be temporarily transferred to an administrative or non-patient unit. *Id*. The defendant refused and instead provided her with a telephone designed for the hearing impaired and ordered her a hearing-impaired stethoscope. *Id*. The court denied the

defendant's motion for summary judgment on the plaintiff's constructive discharge claim, but only because the plaintiff had "adduced evidence of … sufficient additional circumstances as would render her workplace so hostile that a reasonable person would feel compelled to resign …." Id. at 574.  That additional evidence consisted of evidence that her supervisors and coworkers demeaned her and told her that she was incompetent as a result of her disability, the telephone that was provided for her was defective, and the stethoscope that was ordered for her arrived months after she requested it.  *Id*.  In reaching its holding, the court noted one circumstance it could imagine where "the failure to make reasonable accommodation, by itself, *could* create a working environment so hostile that a reasonable employee would resign his or her position."  *Id*. at 573 n.7.  That circumstance involved a hypothetical employee confined to a wheelchair and a defendant employer who refused to build a ramp or elevator, making it impossible for the employee to get to work.  *Id*.

In the instant matter, Plaintiff has not identified any evidence of hostility in addition to the mere failure to make a reasonable accommodation.  The only possible additional evidence the court sees in the record of hostile treatment before Plaintiff resigned is that Ms. Lubega briefly told Plaintiff that she had to have her timesheets co-signed by Ms. Nhire.  However, when Ms. Lubega learned that Plaintiff was unhappy with the situation, she immediately ended her investigation.  There is no evidence that Plaintiff was taunted by any of her supervisors or co-workers on account of her disability, and there is evidence that she was accorded a number of accommodations and adjustments to her position, including numerous offers of private offices, a flexible schedule for her schooling, a modified break schedule, and time off for counseling.

In addition, Defendant has demonstrated that Plaintiff cannot prove that Plaintiff's position remained open, and Defendant sought to fill it.  To the contrary, it is undisputed that

after Plaintiff resigned, Defendant did not fill the position.  Ms. Lubega determined that the home health care quality assurance position was unnecessary because it was not saving Defendant revenue.  The court therefore allows Defendant's motion for summary judgment on Plaintiff's discrimination claims based on her constructive discharge theory.

### 4. Retaliation

Plaintiff claims that Defendant retaliated against her for asserting her right to a reasonable accommodation by unilaterally revoking her year-long accommodation in Ms. Lubega's office on the first floor and refusing to assign her to the office with a window in the prior authorization area on the second floor (Dkt. No. 55 at 16).  In other words, Plaintiff's claim is that Defendant retaliated against her for requesting a reasonable accommodation by denying her the reasonable accommodation.

The ADA's retaliation provision states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter …."  42 U.S.C. § 12203(a).  Similarly, Mass. Gen. Laws ch. 151B, § 4(4) makes it unlawful "[f]or any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter."  Mass. Gen. Laws ch. 151B, § 4(4).  Plaintiff's retaliation claims are governed by the *McDonnell Douglas* analysis.  *See Jones v. Walgreen Co.*, 679 F.3d 9, 20-21 (1st Cir. 2012).  A prima facie case of retaliation under both the ADA and Chapter 151B consists of a showing by the plaintiff that (1) she engaged in a protected activity; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action.  *See Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 81 (1st Cir. 2007); *Psy-Ed Corp. v. Klein*, 947 N.E.2d 520, 530 (Mass. 2011).

Plaintiff easily satisfies the first element.  "Requesting an accommodation is protected conduct for purposes of the ADA's retaliation provision."  *Freadman*, 484 F.3d at 106 (citing *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003)).  Defendant concedes that Plaintiff has met her burden on the first element of her retaliation claim.  However, "[t]o the extent that [Plaintiff] alleges that the failure [to allow her to continue to use Ms. Lubega's office on the first floor or assign her to the office in the prior authorization area on the second floor that had a window], she is simply repackaging her failure to accommodate claim into a retaliation claim. This she may not do."  *See Incutto v. Newton Pub. Sch.*, Civil No. 16-12385-LTS, 2019 WL 1490132, at *5 (D. Mass. Apr. 4, 2019).  *See also Gomez v. Laidlaw Transit, Inc.*, 455 F. Supp. 2d 81, 90 (D. Conn. 2006) ("[A] failure to accommodate cannot constitute retaliation for an employee's request for accommodation."); *Missick v. City of N.Y.*, 707 F. Supp. 2d 336, 356–57 (E.D.N.Y. 2010) ("Defendants' alleged failure to accommodate [the plaintiff's] disability subsequent to an ADA ... protected request cannot be bootstrapped into a viable disability retaliation claim.").  The court therefore allows Defendant's motion for summary judgment on Plaintiff's retaliation claims.

## III.    CONCLUSION

For the above-stated reasons, Defendant's motion for summary judgment (Dkt. No. 45) is GRANTED as to Plaintiff's claims of disability discrimination based on a hostile work environment and constructive discharge and Plaintiff's claims of retaliation and DENIED as to Plaintiff's claims of disability discrimination based on a failure to accommodate.  In addition, Plaintiff's motion for partial summary judgment (Dkt. No. 49) is DENIED, and Defendant's motion to strike (Dkt. No. 60) is DENIED.  The Clerk's Office is directed to schedule a status conference in this case on a date in the near future that is convenient to the court and the parties.

It is so ordered.

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED:  January 18, 2022